**THE LAW OFFICES OF JEREMY C. ROSENBAUM**
By:    Jeremy C. Rosenbaum, Esquire
261 Old York Road, Suite 302A
Jenkintown, PA 19046
(267) 625-8600 FAX (215) 346-5108
JCR@JeremyRosenbaum.com
NJ Attorney ID: 005652011

LAW OFFICES OF MARK S. SCHEFFER
Mark S. Scheffer
P.O. Box 111
Birchunville, PA 19421

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| AUDREY CHAPMAN, | CIVIL ACTION |
| Plaintiff, | NO. |
| v. | |
| INSPIRA HEALTH NETWORK, INC., MICHAEL GERIA, and NICOLE ZUCCONI, | |
| Defendants. | JURY TRIAL DEMANDED |

## **OVERVIEW**

1. Dr. Audrey Chapman seeks actual and punitive damages, counsel fees, and other relief from the harms caused by the defendants' numerous breaches of her legally protected employment rights. Violations include racially biased employment decisions, retaliation for her disclosures of unsafe and unlawful conduct by senior medical staff, contractual breaches, and tortious interference with her contractual relations.

AUDREY CHAPMAN'S ORIGINAL COMPLAINT
1

2. Dr. Chapman's claims arise under the federal Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981 (**"Section 1981"**); the New Jersey Law Against Discrimination (**NJLAD**), N.J.S.A. 10:5-1 et seq.;  the New Jersey Conscientious Employee Protection Act (**CEPA**), N.J.S.A. 34:19-1 et seq.; and the common law of the State of New Jersey.

## PARTIES

3. Plaintiff Audrey Chapman is an African-American adult and doctor of osteopathy now living in the State of Alabama. From July 2015 to June 2016, she was employed as a resident physician in family medicine by Defendant Inspira Health Network, Inc.

4. Defendant Inspira Health Network, Inc. ("Defendant IHN") is a private corporation, organized as a nonprofit entity under the laws of New Jersey. Defendant IHN's principal place of business is its Inspira Medical Center Vineland, located at 1505 West Sherman Avenue in the City of Vineland, in Cumberland County, New Jersey. Defendant IHN's operations include several medical residency programs for licensed physicians in their first years of practice who need to meet licensing requirements, establish their careers, gain depth of experience, develop a range of expertise, maximize opportunities for future employment and other rewards, and cultivate their professional reputations.

5. Defendant Michael Geria, DO, is a doctor of osteopathy who, at all pertinent times, supervised the family medicine residency as Defendant IHN's Director of Medical Education.

6. Defendant Nicole Zucconi, DO, is a doctor of osteopathy who served as assistant program director of Defendant IHN's family medical residency program when Dr. Chapman was a resident there, and referred to herself as the "Co-Program Director." Defendant Zucconi is now the program director of the family medicine residency program.

**JURISDICTION AND VENUE**

7. The District Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1343 and 1367. Separately, the District Court has basis for jurisdiction over all parties as Plaintiff resides in a different state from all defendants and the amount in controversy exceeds $75,000. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to these claims happened in Cumberland County, New Jersey.

**FACTS**

8. On or about March 23, 2015, Plaintiff signed an employment contract ("the Agreement") with Defendant IHN. The Agreement was drafted by Defendant IHN and signed on its behalf by Defendant Geria.

9. The Agreement provided that Dr. Chapman would be appointed as a first-year osteopathic physician in Defendant IHN's residency program in family medicine, beginning July 1, 2015. Defendant Geria signed the Agreement on behalf of Defendant. A copy of the Agreement is attached as Exhibit 1. In the Agreement Defendant IHN made several promises, including:

¶ 3.2: "[t]o use its best efforts…to provide an educational training program that meets accreditation standards;" (The "accreditation standards" here refer to the American Osteopathic Association ("AOA") and its governing manuals, the "Basic Standards for Residency Training in Osteopathic Family Medicine and Manipulative Treatment" and "The Basic Documents For Postdoctoral Training.")

¶ 3.3 "[t]o use its best efforts…to provide the Resident with adequate and appropriate support staff and facilities;"

¶ 3.5 "[t]o provide the Resident with appropriate and adequate faculty and Medical Staff supervision for all educational and clinical activities;"

¶ 3.6: [t]o maintain an environment conducive to the health and well-being of the Resident;"

¶ 3.8: "[t]o evaluate, through the Program Director or his or her designee and Program facility, the educational and professional progress and achievement of the Resident on a regular and periodic basis. The Program Director shall present to and discuss with the Resident a written summary of the evaluations quarterly and/or more frequently if needed;" and,

¶ 3.9: "[t]o provide a fair and consistent method for review of the Resident's concerns and/or grievances, without fear of reprisal."

10. Plaintiff trusted that such promises would be honored.

11. Plaintiff reported to the Vineland medical center for orientation on or about June 22, 2015 and her formal appointment began with the start of the following month.

12. At the time, Dr. Chapman was Defendant IHN's only African-American resident in family medicine.

13. Also at the time, residents in family medicine at Defendant IHN rotated to a different subspecialty around the beginning of each month. After completing an initial July 2015 rotation in surgery, Dr. Chapman moved to inpatient family medicine for August.

14. During that August 2015 rotation, the defendants placed Dr. Chapman under the supervision of David Aderholdt, DO, a white third-year resident in family medicine and a close friend of Defendant Zucconi. (Dr. Aderholdt's wife served directly under Defendant Zucconi as a physician's assistant.)

15. Dr. Aderholdt harassed Plaintiff and treated her with unreasonable disfavor, particularly as compared to non-black interns by: (a) speaking to her in a belittling tone and/or screaming at her, and embarrassing her in front of others; (b) threatening Plaintiff's position by telling her "we have fired people before," and making her feel that she would have not a job with Defendant IHN the following year; (c) telling Plaintiff he did not want her on his rotation; (d) telling Plaintiff she could not see any of his patients; (e) telling Plaintiff she was a "problem" and threatening to email Defendants Geria and Zucconi, as well as Douglas Hargrave, DO, the official Program Director of the Family Medical Residency Program; and, (f) referring to other residents as "Dr." and referring to Plaintiff by her first name, as if she were a medical student.

16. On August 24, 2015 Aderholdt told Plaintiff to "go home" and "leave the building," which would have constituted Plaintiff abandoning her job.

17. Plaintiff contacted Defendant Zucconi, informed her of Dr. Aderholdt's conduct, and indicated that she hoped to resolve any issues with Dr. Aderholdt and see if it would be possible to find productive alternatives to being paired with Dr. Aderholdt in the future. But Plaintiff made clear she did not want to escalate the issues beyond Defendant Zucconi's level, such as to Defendant Geria or the Defendant IHN's human relations ("HR") administrators.

18. Defendant Zucconi told Plaintiff not to go home for the day and expressed hope that the problem with Aderholdt could be worked out under her supervision within the family medicine residency program and not go further.

19. In spite of what she told Dr. Chapman, Defendant Zucconi nonetheless brought the matter to Defendant Geria, who ordered HR staff to respond.

20. On October 16, 2015 Dr. Chapman met with Defendant Geria; Douglas M. Hargrave, DO, Defendant IHN's family medicine program director; Ralph Vicente, Defendant

IHN's HR "business partner;" and Brenda Mulford, the office coordinator for the family medicine residency program.

21. Plaintiff was told that the purpose of the meeting was to discuss the findings of Defendant IHN's HR investigation into her complaint against Dr. Aderholdt.

22. At the meeting, Dr. Geria said the HR staff had done its "due diligence," and found no grounds for disciplining Dr. Aderholdt; Plaintiff's request not to work with Dr. Aderholdt was denied.

23. Contrary to Defendant Geria's statement, HR staff did not act duly or diligently, willfully failing to interview essential harassment witnesses whom Dr. Chapman had identified by name.

24. The meeting then turned to complaints supposedly been received about Plaintiff, though here, essential details were not disclosed to Plaintiff.

25. During the discussion, Plaintiff expressed alarm about the unlawful deception she had seen committed by medical staff at Defendant IHN. In particular, she disclosed that an attending physician ordered the falsification of a patient's medical history file to cover up for recklessly botching surgery to remove fluid from around the patient's lung. Though a pulmonologist had been called to perform the surgery, the attending took over the assignment before the pulmonologist could arrive. He did so despite clearly not knowing what he was doing, fumbling around and failing to properly assemble or operate the surgical equipment. Most importantly when he directed a needle through the patient's flesh, he instructed a resident to blindly poke around, and did so himself, without using an ultrasound imaging device to see where the needle was in relation to the patient's vital organs. This was dangerous because use of an ultrasound is vital to patient safety, as the attending's conduct showed: The needle punctured

the lung, leading to serious and unnecessary complications, such as difficulty breathing and procedures to re-intubate the patient and re-inflate her lung. Dr. Chapman disclosed and objected to the fact that the attending directed that the medical records falsely state that he had used an ultrasound device. Plaintiff reasonably believed this conduct was dangerous and unlawful.

26. Defendants Geria and IHN did not respond receptively to Plaintiff's disclosure.

27. The meeting ended after Defendant Geria made clear that, unless new allegations against Plaintiff arose, he would consider the matters closed regarding both Dr. Aderholdt and the purported allegations against Plaintiff.

28. Around the end of October 2015, Defendant Geria confirmed to Plaintiff that the allegations he had raised were no longer at issue. In other meetings in November 2015, Defendant Geria made no reference to any concerns about her conduct.

29. That autumn, Defendant Zucconi was on maternity leave for several weeks, and so did not have a chance to influence the final determination regarding how to address Dr. Chapman's complaint against Defendant Zucconi's close friend, Dr. Aderholdt.

30. However, after coming back to work, Defendant Zucconi took the next opportunity to punish Dr. Chapman.

31. Dr. Chapman was told to meet with Defendant Zucconi on December 18, 2015, for the purposes of discussing Plaintiff's six-month evaluation.

32. Yet Defendant Zucconi did not provide Plaintiff with an overall evaluation of her skills and performance on her medical rotations, or even reveal whether she had passed or failed her rotations.

33. Instead Defendant Zucconi presented Plaintiff with a disciplinary document, a performance improvement plan ("PIP"). As sole grounds for the "corrective" action Defendant

Zucconi cited the same allegations that Defendant Geria had repeatedly indicated would not be used against Dr. Chapman over the course of the previous two months.

34. After the meeting, Dr. Chapman returned to work her shift for Defendant IHN.

35. In a discussion with Dr. Shirley Ayuk-Takem later that day, Plaintiff confided her frustration about the attacks on her professionalism being made by Defendant Zucconi and asked for advice.

36. When Dr. Ayuk-Takem did offer any advice, Plaintiff said that the false attacks on her had to stop and that it did not appear to matter how much she learned or how competent a physician she was and remarked sardonically, "I should just kill myself" in noting the absurdity of the situation.

37. Dr. Ayuk-Takem informed the attending physician, Dr. Edward Gray, about Plaintiff's comment. Despite expressing doubts about the propriety of doing so, Dr. Gray had Plaintiff report to the emergency room for evaluation.

38. In the emergency room, Plaintiff was examined by Dr. Garret Forosisky and was also seen by a social worker, Lisa Dickerson, who referred their findings to psychiatrist Dr. Stephen Schienthal.

39. Dr. Chapman was told that she could safely return to her daily activities and was discharged without any work restrictions; afterward she completed the remainder of her shift.

40. On Monday, December 21, 2015, Plaintiff reported for work and was told to meet with Defendant Geria before beginning her shift.

41. Plaintiff met with Defendant Geria and Ms. Mulford, the office coordinator for the family medicine residency program, and was immediately placed on an involuntary paid leave of absence.

42. At that time, Plaintiff was in the middle of her intensive care rotation, which was scheduled to run until January 3, 2016.

43. During her leave of absence, Plaintiff was required to attend counseling sessions with Carebridge Corporation and was ultimately required to undergo a psychological/psychiatric examination by Dr. Dale Panzer on January 12, 2016 for the purpose of determining her "fitness for duty" at her place of employment.

44. Plaintiff was cleared to work by Dr. Panzer.

45. At no time before, during, or after her forced leave of absence did a mental health practitioner determine that Plaintiff was incapable of working as a physician or performing any of her daily duties.

46. Plaintiff returned to work on January 27, 2016 and was presented with another PIP document by Defendant Geria at a meeting with him and Mr. Vicente, the HR representative.

47. The new PIP document was different form the one Plaintiff received from Defendant Zucconi on December 18, 2015, and had been altered.

48. The new document stated that it was being issued "for unprofessional behavior," and instructed, "please refer to documentation in personal [*sic*] file for more information."

49. Plaintiff did not behave "unprofessionally," and in fact had (and indeed would be found to have) consistently acted professionally on all of the rotations for which she received evaluations.

50. Contrary to this PIP document, Plaintiff was not permitted to refer to any documentation in her personnel file "for more information" about the false accusations of unprofessional behavior being levied against her, and she has never been provided that information despite her repeated requests.

51. The PIP provided that Plaintiff would be placed on probation for three months, and put her on a schedule where she would have "monthly meetings with the program directors (either Dr. Hargrave or Dr. Zucconi)."

52. Despite the provision in the PIP for monthly meetings with either Dr. Hargrave or Defendant Zucconi, Plaintiff had only one "monthly" meeting, with Dr. Hargrave and Defendant Geria on February 19, 2016. There the trio addressed Dr. Chapman's behavior and performance during her obstetrics and gynecology rotation, which they described as very good.

53. On March 6, 2016 Plaintiff was working a night shift while on her cardiology rotation with a second year resident in family medicine, Sandra Mason, DO.

54. That night, Plaintiff tried to go into the family medicine call room, but found the door was locked. Still, she could hear Dr. Mason speaking about her in a loud voice to another resident, Taner Ulke, DO.

55. Dr. Mason made unprofessional and disparaging remarks about Plaintiff to Dr. Ulke, including: "All of the administration knows about her," and "We are stacking up paperwork against her," and "I highly doubt if she will get another contract anywhere."

56. Dr. Mason, who is white, had also received a PIP for unprofessionalism during her internship year in the family medicine residency program, but the Defendants had treated her more favorably than they would treat Plaintiff; Dr. Mason's PIP did not prevent the Defendants from renewing her contract.

57. Plaintiff had experienced other unprofessional behavior from Dr. Mason prior to this incident, and she included these events in a complaint to Defendant Geria, Dr. Hargrave and Mr. Vicente on March 8, 2016.

58. A month and a half later, on April 25, 2016, Mr. Vicente wrote a letter to Plaintiff, reporting: "it does not appear that any inappropriate behavior or violations of company policy have taken place."

59. On May 5, 2016, Plaintiff met with Defendant Geria, Defendant Zucconi, Dr. Hargrave, and Mr. Vicente. At the meeting, Plaintiff was told that the Agreement was not going to be renewed, and that Plaintiff was being dismissed from the Residency Program for "persistent unprofessional behavior and failure to comply with a performance improvement plan," and "[t]hat this action is in accordance with the AOA Basic Documents for Postdoctoral Training."

60. The written Agreement governing Plaintiff's employment with Defendant IHN provides that "additional training after a leave of absence may be needed for successful completion of the Program," and that "[t]he amount of sick leave, leave of absence, or disability time for the Resident shall be determined by the Program Director."

61. The AOA Basic Documents for Postdoctoral Training provide that "the DME/program director has the authority to extend the trainee contract for a period of up to 3 months for leave, illness or remediation purposes."

62. Plaintiff requested an extension of approximately 6 weeks so that she could complete her intensive care rotation (which had been cut short by Plaintiff being involuntarily placed on leave in December 2015) and her inpatient family medicine rotation (which Plaintiff could not participate in because of the involuntary leave of absence in January 2016).

63. On June 24, 2016, the last scheduled day of Plaintiff's internship, Defendant Zucconi told Plaintiff that Defendant IHN was denying Plaintiff the continued participation needed to complete her first year internship requirements. Defendant Zucconi falsely insisted

Plaintiff that Defendant IHN had never made such an accommodation for a resident. In reality, a white intern who had been on leave for pregnancy that year, had received a similar extension as well as compression of time requirements.

64. Defendants replaced Plaintiff , the only African-American in the family medicine residency program, with a non-African American in Plaintiff's second year residency spot, utilizing federal funding that was allocated for Plaintiff's compensation, and thereby eliminating the presence of any African American in that program.

65. To the extent Defendants allowed her to do so, Dr. Chapman performed her duties under the program in a satisfactory and professional manner. In June 2016 Plaintiff received an annual evaluation prepared by Defendant Zucconi on behalf of Defendant IHN rating as competent in all three metrics identified under the category of "professionalism."

66. The dismissal of Plaintiff from the Residency Program and the refusal to allow her an extension to complete her training during her internship year in the Residency Program has caused her massive ongoing financial losses, emotional distress, and other harms, including preventing Plaintiff from working as a physician (which requires completion of the first or internship year of a residency program) while she seeks entrance into another residency program.

## COUNT I:
### SECTION 1981: RACE DISCRIMINATION IN EMPLOYMENT
**(Plaintiff v. All Defendants)**

67. Plaintiff incorporates the preceding paragraphs as if stated here in full.

68. Defendants' adverse employment actions and ratification of harassment toward Plaintiff were influenced by bias regarding Plaintiff's race, in violation of Section 1981. To wit:

(a) As stated above, Defendants replaced Plaintiff, the only African-American in the family medical residency program, with a non-African-American in Plaintiff's second year

residency spot in the Family Medical Residency Program, diverting federal funding that was allocated for Plaintiff's compensation to do so, and thereby eliminating the presence of any African American in that program;

(b)     Defendants' given reason for preventing Plaintiff's from continuing her residency—their allegation that Plaintiff engaged in persistent unprofessional behavior—is pretextual, contradicted by the June 2016 annual evaluation prepared by Defendant Zucconi and presented to Plaintiff which indicated that Dr. Chapman's conduct was consistently professional;

(c)     Defendants' laxity when it came to truly unprofessional conduct by non-African Americans, when contrasted with Defendants' devastating targeting of Plaintiff, betrays a racially disparate treatment;

(d)     Defendants had offered and allowed a white resident who had engaged in egregious unprofessional behavior by stealing another resident's text books and stealing another resident's credit card to make unauthorized personal purchases to resign in lieu of dismissal and/or non-renewal, while not affording a similar opportunity to Plaintiff, who consequently has had her professional record ruined by the discontinuation of her residency for alleged unprofessional behavior; and,

(e)     Defendants permitted a white intern in the same residency program as Plaintiff an extension of approximately four to six weeks to complete her intern year after a leave of absence, while denying Plaintiff the same opportunity after forcing her to go on a leave of absence that Plaintiff did not request.

69.     All Defendants acted while aware of Plaintiff's protections from race discrimination under federal law.

70. Through their racially biased and disparate conduct, Defendants Geria and Zucconi's intentionally caused the impairment of Plaintiff's rights protected by Section 1981.

71. Defendants Geria and Zucconi determined and directed the actions referenced herein, or otherwise aided, abetted and encouraged such conduct.

72. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings, loss of earning capacity, loss of benefits, pain and suffering, upset, emotional anguish, loss of life's pleasures, attorneys' fees and costs.

## COUNT II
### NJLAD: RACE DISCRIMINATION IN EMPLOYMENT
**(Plaintiff v. All Defendants)**

73. Plaintiff incorporates the preceding paragraphs as if stated here in full.

74. All Defendants engaged in deliberate conduct to harass, discipline, and dismiss Dr. Chapman, betraying a devastating and willful prejudice not shown toward non-black residents under the same supervision at the time.

75. Defendants Geria and Zucconi played substantial roles in aiding and abetting violations by Defendant IHN of the New Jersey Law Against Discrimination (NJLAD), N.J.S.A. 10:5-1 et seq.

76. As such, all Defendants violated the NJLAD.

77. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings, loss of earning capacity, loss of benefits, pain and suffering, upset, emotional anguish, loss of life's pleasures, attorneys' fees and costs.

**COUNT III**
**CEPA: WHISTLEBLOWER RETALIATION**
**(Plaintiff v. All Defendants)**

78.     Plaintiff incorporates the preceding paragraphs as if stated here in full.

79.     The New Jersey Conscientious Employee Protection Act (CEPA) bars employers from retaliating against an employee who "discloses . . . to a supervisor . . . an activity . . . of the employer . . . that the employee reasonably believes: (1) is in violation of a law . . . including any violation involving deception of, or misrepresentation to, any . . . patient . . . or governmental entity, or, in the case of an employee who is a licensed or certified health care professional, reasonably believes constitutes improper quality of patient care." N.J.S.A. 34:9-3(a).

80.     CEPA also bars employers from retaliating against an employee who objects to or refuses to participate in any activity, policy, or practice she reasonably believes to be unlawful, deceptive, misrepresentative, improper in quality of patient care, and incompatible with a clear mandate of public policy concerning the safety of others. N.J.S.A. 34:9-3(c).

81.     Plaintiff engaged in conduct protected by CEPA when she disclosed and objected to the falsification of medical records to indicate that a surgical procedure which resulted in the reckless puncturing of a patient's lung was undertaken with ultrasound guidance when it was not.

82.     Plaintiff reasonably believed such conduct was unlawful, deceptive, misrepresentative, improper in quality of patient care, and incompatible with a clear mandate of public policy concerning the safety of others.

83.     The surgeon's corruption of the medical record violated the statutory law of New Jersey, specifically section 2C:21-4.1 of the New Jersey Code of Criminal Justice, which provides that "[a] person is guilty of a crime of the fourth degree if he purposefully destroys, alters or falsifies any record relating to the care of a medical or surgical or podiatric patient in

order to deceive or mislead any person as to information, including, but not limited to, a diagnosis, test, medication, treatment or medical or psychological history, concerning the patient."

84. Defendants' adverse employment actions were motivated by Plaintiff's protected disclosures and/or objections, and thereby violated CEPA.

85. As a direct and proximate result of Defendants' CEPA violations, Plaintiff has in the past incurred, and may in the future incur, a loss of earnings, loss of earning capacity, loss of benefits, pain and suffering, upset, emotional anguish, loss of life's pleasures, attorneys' fees and costs.

## COUNT IV
### BREACH OF CONTRACT
### (Plaintiff v. IHN)

86. Plaintiff incorporates the preceding paragraphs as if stated here in full.

87. Defendant IHN breached the Agreement with Plaintiff, including paragraphs 3.2, 3.3, 3.5, 3.6, 3.8, and 3.9 quoted above, through a number of acts and omissions, including:

(a) Failing to provide Plaintiff with educational training that met AOA accreditation standards, skipping quarterly and semi-annual written evaluations and resident evaluations which include input from patients and non-physician team members,

(b) Depriving Dr. Chapman of the requisite specialty qualifications to provide training in the Family Medicine Residency Faculty,

(c) Refusing to extend Plaintiff's training program because of her leave of absence and otherwise not permitting Plaintiff to continue training to complete her internship or first year in the Residency Program,

(d) Not providing the required time of five hours per week for "didactics," (e.g., lectures); and

(e) Retaliating against Plaintiff for filing grievances or otherwise expressing her concerns, and not providing a fair and consistent method for reviewing Plaintiff's concerns.

88. In addition, IHN's non-renewal of Plaintiff's contract was motivated by bias and retaliatory animus as described herein and thereby its non-renewal constitutes a breach of the Agreement by being motivated by proscribed conduct, even if the Agreement's provided that Defendant IHN otherwise retained discretion regarding reappointment.

89. Defendant IHN's breach of the Agreement by its refusal to provide promised conditions during the internship, failure to extend Plaintiff's training because of her leave of absence so that she could complete her first year of residency, its unlawfully and improperly motivated dismissal of Dr. Chapman and nonrenewal of her contract, has devastated her medical career and caused her substantial damage and wage loss by depriving her of the ability to currently work as a physician (which requires completion of a resident's internship or first year of residency).

## COUNT V
### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
**(Plaintiff v. IHN)**

90. Plaintiff incorporates the preceding paragraphs as if stated here in full.

91. The Agreement between Plaintiff and Defendant IHN constituted a contract, and thereby carries with it an implied covenant of good faith and fair dealing.

92. Defendant IHN engaged in bad faith in its contractual dealing with Plaintiff and failed to fairly and in good faith carry out its contractual obligations, thereby depriving Plaintiff

of the fruits of the Agreement, such as training and qualifications, and causing harm and damage to Plaintiff as set forth herein.

### COUNT VI
### TORTIOUS INTERFERENCE
**(Plaintiff v. Geria and Zucconi)**

93. Plaintiff incorporates the preceding paragraphs as if stated here in full.

94. Defendant Zucconi and Geria's conduct—for example, their deliberate dismantlement of Plaintiff's ability to adequately complete her internship requirements and continue the normal course of a residency; their decision not to let her make up rotation time they wrongfully kept her from completing; and their dismissal, discontinuation and nonrenewal of her residency contract—was motivated by biases that had nothing to do with Defendant IHN's business interests. Rather major motivations included a personal vendetta against Plaintiff for opposing the harassment of Defendant Zucconi's close friend, Dr. Aderholdt, as well as the racial prejudice and retaliatory agenda established above.

95. As such, Defendants Zucconi and Geria maliciously and tortiously interfered with Plaintiff's existing contractual relationship with Defendant IHN as well as her reasonable expectation of a standard renewal of that contract, in the process, obstructing her options to find employment anywhere else and causing the harms set forth herein.

### RELIEF

96. Plaintiff incorporates the preceding paragraphs as if stated here in full.

97. As the direct and proximate result of all Defendants' unlawful conduct, including via its upper management, on each of these counts individually and together, Plaintiff has suffered and will continue to suffer severe personal hardships including economic loss,

emotional distress, humiliation, pain and anguish, damage to personal and professional reputation, loss of past and future earnings and employee benefits, career displacement and uncertainty, planning difficulties, litigation expenses, counsel fees and further losses as are established at trial.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants on all counts and awarding Plaintiff:

    (a)    reinstatement in Defendant IHN's residency program;

    (b)    lost earnings, past and future, which Plaintiff has suffered as a result of Defendants' improper, discriminatory, and retaliatory treatment, including, but not limited to, past and future wages, lost earning capacity, and other lost benefits;

    (c)    compensatory damages for emotional distress, humiliation, pain, anguish, reputational damage, and other harms;

    (d)    exemplary and punitive damages;

    (e)    the costs of this action, together with reasonable attorney's fees;

    (f)    interest; and

    (g)    such other further relief as law or equity permit.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts of this Complaint.

Respectfully submitted,

THE LAW OFFICES OF JEREMY C. ROSENBAUM

By:    s/Jeremy C. Rosenbaum
       Jeremy C. Rosenbaum, Esq.
       *Attorney for Plaintiff*

Dated: May 5, 2017

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I hereby certify that the matter in controversy in the above-entitled action is not the subject of any other action pending in court, or of any pending arbitration or administrative proceeding.

s/Jeremy C. Rosenbaum<br>
Jeremy C. Rosenbaum, Esq.<br>
*Attorney for Plaintiff*